# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| SILVIA MYERS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. 2:06-CV-650 |
| v. | : | |
| | : | JUDGE ALGENON L. MARBLEY |
| UNITED AIR LINES, INC. | : | Magistrate Judge Abel |
| | : | |
| Defendant. | : | |

## OPINION AND ORDER

## I. INTRODUCTION

This matter comes before the Court on Defendant United Air Lines, Inc.'s ("United")

Motion for Summary Judgment on the only remaining claim against United for workers'

compensation retaliation in violation of Ohio Rev. Code § 4123.90. For the reasons set forth

below, this Court **DENIES** United's Motion.

## II. BACKGROUND

## A. FACTUAL BACKGROUND

### 1. The Parties

United is headquartered in Chicago and maintains a station at Port Columbus

International Airport. Port Columbus operations are governed by an on-site General Manager

who has one Supervisor, an Administrative Assistant, and approximately 50 Customer Service

Representatives ("CSR's") under his supervision. Brian Kennedy ("Kennedy") has been the

General Manager at Port Columbus since 2000. Norm Ingram ("Ingram") has been the

Supervisor at Port Columbus since 2004.

Silvia Myers ("Myers") was hired by United as a CSR in September 1988, and worked as

a CSR for nearly eighteen years, most of which was at Port Columbus. Myers was terminated on February 22, 2006. Prior to her termination, Myers received compliments on her performance from Kennedy and Ingram and had no history of work problems. She was regarded by Kennedy as being "a good, quality United employee."

Myers' job duties consisted of various tasks, including but not limited to, ticket counter duties (including lobby, gate, and baggage service) and automated check-in-control. Approximately half the time, Myers worked at the ticket counter, and Myers spent the remaining time at the gates and checking passengers in for flights. During her employment at Port Columbus, Myers worked a part-time shift, working six hours a day, five days per week, from approximately 4:30 a.m. to 11:00 a.m.

## 2. United Policies and Procedures

During her employment with United, Myers became a member of the International Association of Machinists and Aerospace Workers (the "Union"). As such, Myers' employment was governed by the Collective Bargaining Agreement ("CBA") between United and the Union. The 2003-2009 CBA contains the disciplinary process and grievance procedure for unionized employees.

Employees can be assessed disciplinary action on five levels, referred to as "Levels 1-5". "Level 5" discipline is for termination of employment. The CBA calls for an automatic "Investigative Review Hearing" for any Level 5 discipline. The CBA provides for further appeals and reviews of the Level 5 disciplinary action, and if the issue is not resolved, the matter ultimately moves to a binding arbitration process.

The CBA also has a provision for Occupational Illness or Injury Leave ("Occupational

Leave"). Under this section of the CBA, an employee accrues a specified amount of Occupational Leave for each month of service with United. Employees can accrue up to 800 hours of Occupational Leave. Employees who are on United's Occupational Leave receive their full pay.

Under the terms of the CBA, United specifically reserved the right to monitor an employee's use of Occupational Leave. For example, United may require an employee to undergo a fitness-for-duty examination. At the time of Myers' employment, United had no medical facility in Columbus, or in Ohio. As a result, United could either send employees to a local physician, or it could send employees to its headquarters at the Chicago O'Hare airport location for evaluation by United staff physicians. Before December 2005, Kennedy had never sent an employee to Chicago for a medical examination, with the exception of initial hiring examinations and routine drug testing examinations. Ingram had never sent an employee to Chicago for an examination.

United has policies regarding its administration of a work-related injury, which provide that when an employee has a work-related injury, the General Manager or Supervisor is to provide the employee with an "injury packet" at the time of the report of injury. Such a packet should contain, among other things an Employee Status Form ("ESF"). The ESF is a document used by United to permit communication between a physician, which may be a United physician or the employee's personal physician, and the General Manager or Supervisor. The ESF is supposed to describe the employee's ability to work and/or expected return to work date. The ESF is to be completed within 48 hours after each medical appointment with a treating physician.

In addition to the CBA, Myers' employment was governed by Rules of Conduct for Union employees. Under these Rules, an employee can be disciplined for violations, and the discipline can include discharge. Myers was ultimately found to be in violation of four of the Rules of Conduct: (1) Rule No. 3 – Falsely claiming sick leave pay, occupational injury leave pay; other paid leave or workmen's compensation benefits; (2) Rule No. 22 – Refusing to comply with a direct order of a supervisor or other person in authority; (3) Rule No. 29 – Failing to comply with a direct order of a supervisor or other person in authority; and (4) Rule No. 33 – Unauthorized absence from work. Each of these Rules carry discharge as a possible result.

### 3. Injury Diagnosis and Filing of Workers' Compensation Claim

Myers reported a wrist injury to Kennedy on July 29, 2004. At the time she reported this wrist injury, Kennedy told her that his wife just had carpal tunnel surgery and Myers admits he was sympathetic to her and receptive to her problem. Kennedy directed her to see Dr. Tanner, a physician in the Columbus area, for a medical examination. United had sent Myers to Dr. Tanner a few years earlier when she dislocated her thumb at work. Myers asserts she never received an injury packet or ESF from Kennedy or anyone at United (or United's third-party administrator) for either this wrist injury or for her prior thumb injury. Ingram, Myers' supervisor, admitted he had never even heard of an ESF until it arose as an issue for Myers' wrist injury claim.

In October 2004, Dr. Tanner directed Myers to have an electromyogram on her wrists to assess the injury, which resulted in his diagnosis of bilateral carpal tunnel syndrome. Myers filed a workers' compensation claim. Myers admits that no one discouraged her from filing a claim, and she does not recall anyone making any negative comments to her about filing a claim.

After the carpal tunnel diagnosis, the workers' compensation third-party administrator,

Gallagher Basset, determined she needed to be examined by an Independent Medical Examiner ("IME"). Therefore, on December 1, 2004, Myers had an examination with Dr. Steinman, also a Columbus area physician. Myers had received approximately two weeks advance notice of her appointment with Dr. Steinman. Following the examination, Dr. Steinman determined that Myers did need surgery, but also determined that United was not the cause of the carpal tunnel. United then terminated the workers' compensation claim.

Thereafter, Myers hired a workers' compensation attorney to pursue her rights under the workers' compensation system and seek an allowance for carpal tunnel surgery. Over the next few months, United exhausted its full appeal rights in contesting Myers' claim through Ohio's administrative proceedings. Myers' claim was eventually allowed for carpal tunnel in April 2005. This claim granted a medical allowance for surgery on both wrists.

### 4. June Surgery

Myers had the first outpatient surgery on her left wrist on June 30, 2005. Prior to the surgery, Myers requested several vacation days in June in order to prepare for the surgery. Myers asserts that when she asked Kennedy to move a few of her vacation days, he responded, you "planned this" and "who knows if United was the cause for your carpal tunnel?" Her request conflicted with United's local policy on selecting and awarding vacation time at the beginning of each year, so Kennedy initially refused the request. Her Union representative worked with United, however, and eventually resolved this issue. Myers was permitted to take the requested days off and was not denied vacation leave. Myers asserts she did not receive an injury packet, ESF, or any other instructions at the time she took her leave.

For the June surgery, there were no complications from the procedure. After this surgery,

Myers was up and around two days later, and was able to drive her car to therapy sessions within four days. She was also able to care for her two young children, who were on break from school. Because Myers was on Occupational Leave under the CBA, she was paid in full during her leave. Myers had no contact with Kennedy during this time, and no one from United made negative comments to Myers about her leave.

Myers returned to work on August 9, 2005, to a light-duty position. Her total leave time was 28 days. Her light-duty restrictions merely restricted the use of her left hand. Because her restrictions did not impact her schedule. Myers returned to work in her same position, on her same shift, with the same hours she had before her surgery. Myers understood her restrictions, and admits that no one from United directed her to do work that was inconsistent with her abilities or limitations.

### 5. November Surgery

Before the second surgery leave, Kennedy asked Myers how long she would be on leave. Myers responded that it would likely be about six weeks. Myers asserts Kennedy answered, "Oh, we'll get you back here before that." Myers had the second outpatient surgery on her right wrist on November 21, 2005. Myers asserts she did not receive an injury packet, ESF, or any other instructions before taking this leave.

Once again, Myers experienced no complications from the procedure. Myers attended hand therapy sessions during her leave, and the use of her wrist steadily improved. Her treating physician's notes show that her right hand was improving faster than her left; that she had no swelling or infection; that she had use of her hand shortly after her surgery; that she was capable of "basic independent care"; and that she was already able to grasp objects with her right hand as

early as December 9, 2005. Furthermore, her treatment notes indicate that, as of December 13, 2005, Myers "report[ed] she's using the hand for everything but has wrist pain on occasion," and had full range of motion, with some limitations due to mild pain. Like her first surgery, Myers admits that within a week she was able to drive, and had no restrictions on standing, walking, driving, flying, or traveling.

The first time Myers heard from Kennedy while on leave was when he contacted her on December 19, 2005, about a month after surgery, to inquire about her status. Myers admits she had no complaint with this call and that there was nothing inappropriate, because United was entitled to know what her status was, as well as when she was returning to work. According to Myers, Kennedy left a voice mail message stating, "Silvia, I know you saw Dr. Cook last Friday and have had therapy sessions. Let me know what is going on." After receiving Kennedy's message, Myers called Kennedy back the same day and left a voice mail message advising that everything was "on schedule," her hand was improving slowly, she was attending her therapy sessions, and her next follow up appointment was scheduled for January 6, 2006.

Kennedy sent an email to Jennifer Mark ("Mark"), United's Risk Specialist, that stated,

I left a message on Silvia's answering machine. She called back around 10:30 last night. Advised me that everything is on "schedule" and she is going to therapy - her hand is weak. She mentioned Jan. 6 as a follow up date with Dr. Cook. Appears she has no intentions of returning until after the New Year. Can you get involved to see if Silvia is fit for light duty? No lifting - just talking with our customers as the lobby queue person.

Mark responded to Kennedy,

I received your message along with the forwarded message that Silvia left you. "On schedule" is insufficient information regarding her current work status. I will try to contact Dr. Cook's office personally and see if they would be agreeable to releasing her to transitional duty with no use of the affected extremity, which I believe is more than reasonable.

## 6. ESF Form

On December 20th, Kennedy called Myers again and left a voice mail message, which stated that neither he nor Gallagher Bassett had received an ESF form and that he had no idea what was going on with Myers' status. Kennedy requested that Dr. Cook fill out an ESF. Myers had not received an ESF from United. She informed Dr. Cook's office that same day that Kennedy was wondering where something called an "ESF form" was. It was Myers' understanding, after ending the call ,that Dr. Cook's office would be sending the completed ESF back to United. Myers also returned Kennedy's phone call and left a message informing him she received his message and had contacted Dr. Cook's office regarding his questions.

Mark also spoke to Dr. Cook's office about preparing an ESF. She faxed an ESF form with a light-duty job description for a "lobby queue agent" to Dr. Cook. That job description stated:

> We can accommodate light duty for this employee with a position as a lobby queue agent. This would involve standing and directing customers through our queue lines at our ticket counters. This light duty assignment would involve no lifting and no typing. Due to the nature of airlines during this season, she would be of great benefit to us if you would be willing to release her with the above mentioned work restrictions as soon as possible.

The "lobby queue agent" position was a position Myers had worked in during the past, including upon her return to work from her June 2005 surgery.

On December 21, Myers asserts she received a message from Kennedy that she perceived to be threatening, stating:

> I still have not received the Employee Status Form so we don't know what is going on. If your doctor does not release you I will send you to Chicago to a doctor who will release you.

In response, Myers again called Dr. Cook's office to ask that they respond to Kennedy's request.

Myers called Kennedy and left a message stating she had called Dr. Cook's office and relayed Kennedy's request.

Dr. Cook's office filled out the ESF form, with the lobby queue agent job description attached, and sent it to Mark on December 21. In that ESF, it states Myers is "released with the following physical capabilities until . . . 1/16/06." Further down on the ESF, however, there is a statement that Myers' "anticipated return to work date is January 16, 2006." Myers asserts Dr. Cook's office called Myers to tell her that she was not released to return to work until further evaluation on January 6, 2006.

After Mark received the ESF, she informed Kennedy that Myers had been released to return to work, and as a result, Kennedy contacted Myers and stated that she "had been released to light duty and to call Norm Ingram and get back on the schedule." Myers responded that she was not released to return to work. Because of Myers' rejection of her physician's release, Cindy Brooks ("Brooks") of Gallagher Bassett then contacted Dr. Cook's office for clarification. Dr. Cook was not available, and instead, a nurse in Dr. Cook's office verbally indicated there was some error on the form and that Dr. Cook had not released Myers to return to work. According to the nurse, Dr. Cook's secretary should not have marked the "patient is released . . ." block and Dr. Cook wanted to reevaluated Myers on January 6, 2006 before releasing her. Brooks requested a revised ESF; such a revised ESF, however was never received.

### 7. Direct Order for Chicago Appointment on December 23rd

Following the notice from Brooks that Myers had *not* been released to return to work, Kennedy prepared a direct order for Myers to fly to Chicago and back the very next day for a physician's appointment. Dr. McGuffin had also informed United that he had two later dates of

availability, December 27, 2005 and December 28, 2005, yet Kennedy chose to give Myers a direct order to fly to Chicago the next day.

The letter stated:

> Silvia, this letter serves as a direct order to see Dr. Robert McGuffin, ORDMD on Friday, December 23, 2005 no later than 4:00 p.m. central time . . . It is your responsibility to make yourself available to report to United Airlines Medical (ORDMD) as directed above, refusing and/or failing to comply with a direct order is a violation of the rule of conduct of IAMAW represented employees and may result in a disciplinary action up to and including discharge.

The letter also directed Myers to contact Ingram if she had any questions. Kennedy directed that the letter be hand delivered to Myers by courier, and she received it at approximately 5:00 p.m. on December 22, 2005. United had approximately six direct flights each way between Chicago and Columbus, so United was able to place Myers on a flight in the morning of her examination, and return her to Columbus by the afternoon.

Myers asserts that was unable to arrange travel plans to Chicago for December 23, 2005 because her husband had a small business to run and she had two small children who were home on break at the time. Kennedy was aware that the Myers had two small children. The Myers do not rely on, and did not have childcare available.

Myers called Ingram on December 23, 2005 and informed him she could not travel on such short notice because she had to take care of her children who were home on break from school. Ingram had never sent or been told to send an employee to Chicago for a medical examination, and was not aware of any United employee being sent to Chicago for a medical examination before this occasion. Kennedy himself had not sent an employee to Chicago for a medical examination before, with the exception of initial hiring exams and routine drug testing exams.

Myers also explained to Ingram that if the physician was local, it would not be a problem since she could take her children with her. She also informed him that she had moved up her appointment with Dr. Cook to December 30. Finally, she informed him that any further communication needed to go through her workers' compensation attorney, Tom Morgan ("Morgan"). According to Myers, she felt the need to get Morgan involved based on Kennedy's threatening statement that he wanted to send her to a physician "who would release her" and the direct order to travel to Chicago on such short notice.

Kennedy subsequently contacted Morgan on December 23. Morgan explained to Kennedy that Myers was willing to submit to a medical examination upon receiving reasonable notice of an examination. Morgan did not consider the order to go to Chicago on its face to be unreasonable; rather, he considered the short notice to travel to Chicago to be unreasonable. Morgan sent the following letter to Kennedy on December 30, 2005, memorializing this conversation:

> First, in regard to appearing for an examination by your doctor, please be advised that Ms. Myers will fully cooperate in attending an examination provided you (1) give her sufficient advance notice and (2) the location of your physician is reasonably convenient for Ms. Myers. Contacting her on the afternoon of December 22nd to appear for a medical examination the next day in Chicago is objectively unreasonable.
>
> Second, if you have light duty work available, please provide a written description of the lighter work demands so orthopedist Cook may determine if his patient is physically able to perform it. It has only been one month since the last surgery. It is my understanding that you referred Ms. Myers to Dr. Cook. Clearly, Ms. Myers' established character indicates that she will cooperate in appearing for an examination and return to lighter work if she is physically able.

### 8. Direct Order for Chicago Appointment on December 29th

On December 27,  Kennedy had another letter delivered to Myers by courier, that arrived

at approximately 7:00 p.m., which contained another direct order for Myers to go to Chicago for a medical evaluation on December 29 no later than 4:00 p.m. The letter explained that she had been given a direct order to fly to the Chicago physician because the document provided by her physician "was unclear and confusing about [her] current ability to perform transitional duty that is consistent with [her] medical restrictions." The letter also stated that her failure to comply with the December 22, 2005 direct order was going to result in termination of her Occupational Leave pay as of December 22, 2005. The letter warned that her refusal or failure to report to Chicago as ordered may place her in violation of Rules of Conduct #22, #29, and #33, and may subject her to discipline up to and including discharge. She was directed to contact Kennedy directly to arrange for business travel to Chicago. United actually scheduled a flight for her to leave at 7:44 a.m. and return at 12:58 p.m.

As before, Myers asserts that her child-care issues and her husband's business did not permit her to travel to Chicago on such short notice. Myers called Kennedy's office at approximately 9:40 p.m. on December 28, 2005. She left a voice mail message explaining that she could not travel to Chicago on such short notice. She again explained child-care needs and that she had moved her appointment with Dr. Cook to December 30, 2005. Myers received no other orders to report to Chicago.

Kennedy concluded that the reasons provided by Myers, short notice and child-care, were not good reasons to not follow a direct order. Kennedy asserts he considered "the failure and refusal of her not following the Company's directives to be a serious violation in and of itself," which he later claims was the compelling reason for him to propose her termination. Kennedy determined that he needed to conduct an investigation of Myers' conduct pursuant to the CBA.

### 9. Myers' Return to Work and Investigative Meeting

Myers attended her appointment with Dr. Cook on December 30, 2005. On that date, Myers was having problems with loss of strength and hypersensitivity, and thus, Dr. Cook recommended continued therapy and delay of return to work until January 16, 2006. Dr. Cook then reevaluated Myers again on January 6, 2006 and released her to return to work on January 9, 2006. Upon receiving this release to return to work, Myers called Ingram and was placed on the schedule to work on January 10, 2006. At the time of this release, Myers felt that she was fully capable of performing the position, and did not request additional time or altered restrictions.

Myers reported to work at 4:30 a.m. on January 10, 2006, her normal shift time. She worked the lobby queue agent position with no issues, until approximately 6:30 a.m., when Ingram informed Myers that she needed to go to Kennedy's office for an investigation of what occurred during Myers' leave. Kennedy had arranged for a Union representative to be present for the meeting to represent Myers. Myers also requested, and was granted, the presence of another Union representative. Myers asserts she was surprised by the meeting. However, Kennedy had informed Union committeeman Joe Hitzeman that the investigative meeting was going to take place upon Myers' return to work, and neither Hitzeman , nor anyone else from the Union, informed Myers of this meeting.

The investigative meeting went forward in Kennedy's office. During the meeting, several witnesses took notes, and Myers was asked to explain what had transpired during her leave of absence, and was asked about the two direct orders to fly to Chicago. Myers was also informed that her conduct had violated the Rules of Conduct for Union employees, and that these

violations may be a cause for United to terminate her. Myers asserts that the way Kennedy spoke to her was threatening, vindictive, and hostile. She claims, "I was not treated like a human being in that inquisition of 100 minutes." Many times during the meeting Myers asked if they could delay the meeting so she could get notes. Kennedy, however, refused the request for postponement.

At the meeting, Myers again advised that she was unable to travel to Chicago for the medical exams due to short notice and childcare needs. Kennedy did not consider the reasons provided by Myers to be satisfactory, and determined that Myers was to be held out of service. As a result of the meeting, Myers was aware she was relieved of her duties, that she was no longer to report to work, and that she was "let go" until the next step in the grievance process. She handed over her badge and keys and was escorted out of Port Columbus.

After the meeting, but before February 22, 2006, Kennedy decided to recommend a Level 5 disciplinary discharge of Myers, pending an Investigative Review Hearing ("IRH") under the terms of the CBA. Kennedy's boss, Deb Behr, played no role in the termination decision.

### 10. Review and Grievance

As a result of the recommendation for a Level 5 disciplinary discharge for Myers, an IRH was held on February 10, 2006, and Myers appeared for the hearing. Myers was represented at the hearing by the Union. The hearing officer issued her decision, upholding the termination. Myers was officially terminated on February 22, 2006. Myers filed an appeal.

As a result of Myers' appeal, a step three hearing was held on August 24, 2006, in front of Hearing Officer Bill Byrnes, pursuant to the terms of the CBA. Again, Myers appeared for the hearing and was represented by the Union. On September 29, 2006, Byrnes issued his decision

upholding Myers' termination.

After the decision, the grievance moved to the fourth and final step of the CBA procedure—binding arbitration. The arbitration was held on April 17, 2007, before neutral arbitrator Frederic R. Horowitz. On May 21, 2007, Arbitrator Horowitz issued his decision, upholding Myers' termination.

## B. PROCEDURAL BACKGROUND

Myers sued United, on June 29, 2006 in the Franklin County, Ohio Court of Common Pleas. United then removed the case to this Court on July 28, 2007, on the basis of both federal question jurisdiction and diversity jurisdiction. Myers subsequently amended her Complaint on three separate occasions. In her Third Amended Complaint, the only remaining claim against United is for workers' compensation retaliation in violation of Ohio Rev. Code § 4123.90. United has moved for summary judgment on this claim.

## III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). But the non-moving

party "may not rest upon its mere allegations." Fed.R.Civ.P. 56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

## IV. LAW & ANALYSIS

## A. THE BANKRUPTCY CONFIRMATION ORDER

As a result of United's Petition for Bankruptcy Protection, filed on December 9, 2002, the Bankruptcy Court entered a Confirmation Order on United's Reorganization Plan (the "Plan") on January 20, 2006. Pursuant to the Plan, all pre-confirmation claims that arose against United were discharged and released, and claim holders were permanently enjoined from commencing or continuing an action with respect to such claims. The Confirmation Order expressly approved and incorporated those portions of the Plan, providing that all claims are "conclusively, absolutely, unconditionally, irrevocably, and forever . . . released and discharged." (Confirmation Order at pp. 3-4). Likewise, the Confirmation Order expressly approved those portions of the Plan providing that all claim holders are permanently enjoined from commencing or continuing any action to collect or recover any debt discharged by the Plan. (Confirmation Order at pp. 4-5).

Under 11 U.S.C. §§ 1141(d), a bankruptcy court's confirmation of a reorganization plan "discharges the debtor from any debt that arose before the date of such confirmation . . . whether or not . . . the holder of such claim has accepted the plan" *In re Eagle-Pitcher Indus., Inc.*,  447 F.3d 461, 464 (6th Cir. 2006). The Bankruptcy Code defines the term "debt" as "liability on a claim." 11 U.S.C. § 101(12). The term "claim" is broadly defined to mean any "right to

-16-

payment." 11 U.S.C. § 101(5). United asserts that the events underlying the termination decision occurred prior to January 20, 2006; accordingly, the Confirmation Order operates to bar any attempt by Myers to hold United liable for the termination claim that "arose prior to the Bankruptcy Court's Confirmation Order."

Myers does not dispute that the Confirmation Order for United discharges any debt or claim that arose before the date of such confirmation. Myers disputes, however, that her claim for retaliatory termination under workers' compensation provision § 4123.90 "arose prior to the Bankruptcy Court's Confirmation Order." She asserts that the retaliatory termination for which she is suing occurred on February 22, 2006, which was one month after the bankruptcy Confirmation Order.

None of the cases cited by United supports its theory that Myers notice of a potential discharge gives rise to a retaliatory termination claim. In *Kresmery v. Serv. Am. Corp.*, 227 B.R. 10 (D. Conn. 1998), the discriminatory conduct, which was the basis of the disability discrimination claim, took place before the bankruptcy order confirmation date. *Id.* at 14. Therefore, even though the claim was not filed until after the confirmation, the claim was discharged because it arose prior to confirmation. *Id.* Likewise, in *McSherry v. Trans World Airlines, Inc.*, 81 F3d 739, 740 (8th Cir. 1996) and *Cross v. K.B. Toys*, No. 05 C 6137, 2006 WL 2437831, at *3 (N.D. Ill. Aug. 22, 2006), the plaintiff's employment was terminated before the bankruptcy confirmation, but the plaintiff did bring suit until after the confirmation; therefore, the claim was discharged because it arose prior to confirmation. Id. In *Kresmery*, *McSherry*, and *K.B. Toys*, the complained of actions occurred before the confirmation; the plaintiffs simply failed to bring suit until after the confirmation. In this case, the complained of action, the

termination, occurred after the confirmation.

United also argues that *In re U.S. Airways, Inc.*, No.04-13819-SSJ, 2007 Bankr. LEXIS 1105 (E.D. Va. Apr. 2, 2007) supports its position. In that case, the Court stated,

> a claim may exist for bankruptcy purposes even if suit could not yet be brought for it under non-bankruptcy law or the statute of limitations has not yet begun to run, provided that the event or events which give rise to the liability occurred . . . prior to confirmation.

*Id.* at *12. In *U.S. Airways*, an employee filed a complaint with the EEOC before the employer's confirmation order, but the employee did not receive her Notice of Right to Sue letter from the EEOC until after the confirmation order. *Id.* at *3. The *U.S. Airways* court was simply recognizing that although the employee could not bring a claim in a court of law until she received the EEOC letter, the claim arose when she was able to file a complaint with the EEOC. In this case, Myers could not have filed a complaint in a court of law or with any administrative body for retaliatory termination prior to February 22, 2006 because she had not yet been terminated. This case differs from *U.S. Airways* because the complained of action occurred after the confirmation.

In *O'Loghlin v. County of Orange*, 229 F.3d 871 (9th Cir. 2000) the employer argued that a discrimination claim occurred pre-confirmation "because its alleged failure to accommodate *O'Loghlin* was part of a continuing course of conduct that took place both before and after discharge." *Id.* at 874. The court rejected that argument:

> a defendant cannot insulate itself from liability by engaging in a series of related violation of Title VII and asserting that the statute of limitations has run for all violations as soon as the limitations period has run for the first violation in the series.

*Id.* at 875. In this case, any claims for actions that took place before the confirmation (i.e.,

Kennedy stopping Myers pay, Kennedy suspending Myers) were discharged. However, the termination took place after the confirmation. And like in *O'Louglin*, if that action was itself a violation of the workers' compensation laws, it is not discharged just because other earlier violations were discharged.

Myers claim for workers' compensation retaliation began as a claim asserting: "Defendant's conduct towards, and termination of, Plaintiff were in retaliation for Plaintiff filing a claim for benefits under the Ohio Workers' Compensation Act." (Complaint at p. 5). Myers, however, amended her complaint to allege only, "[Defendant's] ***termination of Plaintiff*** was in retaliation for Plaintiff filing a claim for benefits under the Ohio Workers' compensation Act." (First Amended Complaint at p. 6, emphasis added). This suit is now solely for Myers' termination, which occurred on February 22, 2006. Other actions of United that occurred prior to the termination, including actions that occurred prior to the Confirmation Order, may be relevant evidence to establishing that the termination was retaliatory; Myers, nevertheless, is not seeking to hold United liable for any of those other actions, as any claim for actions occurring prior to January 20 are discharged.

Finally, United asserts that regardless of when Myers termination actually occurred, Myers was aware of her termination on January 10, 2006, and thereby, her termination claim arose at that time. The initial meeting regarding Myers' conduct occurred on January 10. There is no dispute that Myers was suspended on that date as a result of that hearing, and that she was informed that United was taking the position that her violations of the Code of Conduct were cause for them to terminate her employment. Myers was therefore on notice of a ***potential*** future discharge at that time. Kennedy, however, did not terminate Myers that day. Kennedy even

admitted that he did not make the decision to recommend termination of Myers until after the meeting, and he could not testify as to whether his recommendation was made before or after January 20, the confirmation date.

Furthermore, even after Kennedy recommended discharge, such discharge was not inevitable, as Myers was still entitled to an IRH under the Union grievance process. *Compare Delaware State Coll. v. Ricks*, 449 U.S. 250, 257-58 (1980) ("[i]t appears that termination of employment at Delaware State is a delayed, but inevitable, consequence of denial of tenure"). An IRH was an integral part of the decision-making process and termination could not be made without one. An IRH was used to determine the consequence of Myers' behavior, rather than to implement the consequence of Kennedy's decision to terminate her.

The purpose of the bankruptcy laws is to provide a "fresh start" to a discharged debtor. *U.S. v. Sotelo*, 436 U.S. 268, 280 (1978), *cited by O'Loghlin*, 229 F.3d at 875. "A suit for illegal conduct occurring after discharge threatens neither the letter nor the spirit of the bankruptcy laws. A 'fresh start' means only that; it does not mean a continuing license to violate the law." *O'Loghlin*, 229 F.3d at 875. The purpose of discharge would not be effectuated by discharging Myers' claim. Myers is only pursuing a retaliatory termination claim that arose post-confirmation and is not, therefore, affected by the pre-confirmation discharge.[1]

## B. WORKERS' COMPENSATION RETALIATION CLAIM

Myers alleges that United violated Ohio Rev. Code § 4123.90 when it terminated her employment on February 22, 2006, allegedly in retaliation for filing a workers' compensation

---

[1] Though some events that occurred prior to Myers' termination may be relevant to establishing retaliatory termination, she cannot seek relief for any allegedly retaliatory actions that occurred prior to the Confirmation Order.

claim for carpal tunnel syndrom. The statute states:

> No employer shall ***discharge***, demote, reassign, or take any punitive action against any employee ***because the employee filed a claim*** or instituted, pursued or testified in proceedings under the workers' compensation act for an injury . . . which occurred in the course of and arising out of his employment with that employer.

Ohio Rev. Code § 4123.90 (emphasis added).

In this case, there is no direct evidence that the termination was in retaliation for filing a workers' compensation claim.[2] In the absence of direct evidence: (1) the plaintiff must establish a prima facie case of retaliation; (2) the burden then shifts to the employer to articulate a legitimate nonretaliatory reason for the discharge; and (3) the burden then shifts back to the plaintiff to prove that the reason offered by the employer is pretextual and that the real reason for the discharge was the employee's protected activity under the Ohio Workers' Compensation Act. *Davison v. Roadway Express, Inc.*, 562 F.Supp.2d 971, 982 (N.D. Ohio 2008); *Kilbarger v. Anchor Hocking Glass Co.*, 697 N.E.2d 1080, 1083-84 (Ohio Ct. App. 1997).

### 1. Prima Facie Case

To establish a prima facie case of retaliation under § 4123.90, Myers must show that: (1) she was injured on the job; (2) she filed a workers' compensation claim; and (3) there was a causal connection between her filing of the workers' compensation claim and her termination. *See Wilson v. Riverside Hosp.*, 18 Ohio St.3d 8, 10 (1985); *Davison*, 562 F.Supp.2d at 982.

---

[2]"Direct evidence is that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Johnson v. The Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (citations omitted). Moreover, direct evidence requires that the fact finder cannot "draw any inferences in order to conclude the challenged employment action was motivated at least in part by prejudice . . . " *Id.* Because of this, it is the "rare situation when direct evidence is readily available." *Kline v. TVA*, 128 F.3d 337, 348 (6th Cir. 1997).

Myers has established the first two elements because she was injured on the job and filed a workers' compensation claim. The parties dispute, however, whether she has shown there was a causal connection. "The statute protects only against termination directly precipitated by the filing of a workers' compensation claim." *Markham v. Earle M. Jorgensen Co.*, 741 N.E.2d 618, 625 (Ohio Ct. App. 2000); *see Metheney v. Sajar Plastics, Inc.*, 590 N.E.2d 1311, 1314 (Ohio Ct. App. 1990). The statute does not, however, preclude employers from terminating employees for any lawful reason. *White v. Mt. Carmel Med. Ctr.*, 780 N.E.2d 1054, 1063 (Ohio Ct. App. Ct. 2002), *cited by Davison*, 562 F.Supp.2d at 981; *see also Metheney*, 590 N.E.2d at 1314 ("[o]ther reasons for discharging an employee, regardless of their propriety, are not regulated by R.C. 4123.90").

Myers filed her workers' compensation claim in October 2004, and was not terminated until February 22, 2006. Therefore, there is a 16 month span between when she filed the claim and when the allegedly retaliatory termination occurred. A time span of over one year from the time an employee files a claim to the time of her termination "militates against a finding of retaliatory discharge." *Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co.*, 783 F.2d 50, 54 (6th Cir. 1986, emphasis added), *cert denied*, 478 U.S. 1006 (1986), *cited by Baker v. The Buschman Co.*, 713 N.E.2d 487, 492 (Ohio Ct. App. Ct. 1998) (finding that the plaintiff's alleged retaliatory actions occurring more than one year after he filed a race discrimination claim did not establish a causal connection). A lengthy internal, nevertheless, does not ***preclude*** a finding of causation.

In *Simmons v. Wal-Mart Associates, Inc.*, No. 2:04-CV-51 (S.D. Ohio July 19, 2005), the plaintiff filed workers' compensation claims in November 1998 and November 1999, and was terminated in August 2003. *Id*. at *14. The length of time between the dates the claims were filed

and plaintiff's termination did not raise a reasonable inference of retaliatory motive. *Id*. The court stated, however:

> [T]he Court is aware of no authority that states that close proximity of the date of filing and the date of adverse action is a requirement. Although the lack of proximity can weaken the inference of retaliation, it does not necessarily prevent a claim from going forward. Rather, the Court must examine all relevant events in its causation analysis.

*Id.* The court found that a reasonable approach to the proximity issue is to examine the proximity of plaintiff's termination to other significant events, such as ongoing requests for various medical procedures, in addition to the initial filing. *Id.* (citing *see Doss v. Hilltop Rental Co.*, No. C030129, 2003 WL 22269362, *7 (Ohio Ct. App. Oct. 3, 2003) (considering not only the proximity of the termination to the initial filing, but also the proximity of the termination to the employee telling her supervisor that her doctor had recommended additional surgery)). The court found it relevant to the causation analysis that several of the plaintiff's requests for benefits occurred around the time of his termination. *See id.* at *16.

Besides considering the proximity of filing a workers' compensation claim to termination, a hostile attitude by an employer can also establish causation. *See Davison,* 562 F.Supp.2d at 982 (citing *Boyd v. Winton Hills Med. & Health Ctr., Inc.*, 727 N.E.2d 137, 140 (Ohio Ct. App. 1999)); *Doss*, 2003 WL 22269362, at *2. In *Doss*, to prove her termination was based on retaliation, the plaintiff claimed that her supervisor developed a hostile attitude towards her after she filed her claim. 2003 WL 22269362, at *3. The court recognized that evidence of a hostile attitude, which included both hostile actions and hostile comments by a supervisor, could help establish retaliation. *See id.* at *3-5.

In this case, there is no temporal proximity between Myers' filing of the workers'

compensation claim and the allegedly retaliatory termination. Myers asserts, however, that like the *Simmons* case, a continuity of retaliatory animus may be found, as "the catalysis and common thread through General Manager Kennedy's treatment of Ms. Myers has been his rejection of her claim that she had been injured on the job." In other words, Myers asserts, Kennedy's "original opposition to her Workers' Compensation claim permeated his treatment of Ms. Myers." As such, Myers claims the Court should examine the proximity of Myers' termination to other significant events, such as her second surgery, which occurred three months before her termination. Significantly, her Occupational Leave pay was terminated during her leave for that surgery, and once she returned from leave for that surgery, she was suspended the next day and fired the next month.[3]

The undisputed facts show that no one at United discouraged Myers from filing a workers compensation claim and no one made any negative comments to her about filing a claim. The workers' compensation third-party administrator, Gallagher Basset, determined Myers should have an IME. United and Kennedy had nothing to do with this determination. The physician performing the IME determined that United was not the cause of the carpal tunnel. Based on this, United terminated her workers' compensation claim. The claim was eventually allowed in April 2005, and Myers was granted a medical allowance to have two separate surgeries for her wrists. None of these facts establishes a hostile attitude by anyone at United towards the filing of Myers' workers' compensation claim.

In June 2005, however, shortly after Myers workers' compensation claim was approved

---

[3]Myers is not bringing a claim for the termination of her Occupational Leave pay or for the suspension, nor would she be able to pursue such claims as they would have been discharged in bankruptcy.

and just prior to her first surgery, Myers asserts Kennedy made hostile comments to her. When Myers asked Kennedy to move a few of her vacation days, Myers asserts Kennedy told her that she "planned this" and told her "who knows if United was the cause for your carpal tunnel." There is no dispute that when Kennedy told Myers she "planned this," Kennedy was referring to Myers' request to take additional vacation days prior to her June 2005 surgery, and this was not related to time off for the actual surgery. The second comment, however, was made after United had exhausted its full administrative appeal rights in contesting Myers' claim, and it had been determined that the claim was allowed. His comment in suggesting that United was not the cause of her carpal tunnel therefore could be viewed as evidence of hostility towards the recent approval of Myers' workers' compensation claim.

In relation to Myers' second surgery, which occurred three months before her termination, Myers points to two additional comments that she alleges Kennedy made. In response to Myers' estimation that her second leave could take as long as six weeks, Myers alleges Kennedy responded, "we'll get you back before that." Additionally, Myers alleges that after her surgery, on December 21, 2005, Kennedy told her in a threatening manner that "if Dr. Cook does not release you" then he would "send her to a doctor in Chicago that would." These comments could be viewed as evidencing hostility toward Myers' ongoing workers' compensation claim and the amount of time Myers' was taking off for that claim. *See also Doss*, 2003 WL 22269362, at *7 (comments were "expressing unhappiness over the length of time [plaintiff] was receiving workers' compensation benefits for her carpal tunnel syndrome").

Furthermore, other actions taken by Kennedy could be viewed as demonstrating hostility towards Myers' prolonged workers' compensation claim. Kennedy issued a direct order to

Myers, sent by courier on December 22, ordering her to fly to Chicago the next day for a medical evaluation. At the time Kennedy issued this order, the doctor in Chicago also had openings on the 27 and 28, yet Kennedy chose to order Myers to fly out the next day. After being informed by Myers' attorney that she was willing to get the requested medical evaluation as long as she had reasonable notice before the appointment, Kennedy stopped Myers' Occupational Leave pay and sent another direct order, ignoring her attorney's request, ordering her to fly to Chicago in two days for a medical evaluation. Kennedy had never ordered an employee to fly to Chicago for a medical examination before, with the exception of initial hiring exams and routine drug testing exams. And Ingram, Myers' supervisor, had never sent an employee to Chicago for a medical examination before. In fact, when Myers had her IME the year before, she had been sent to a local physician. And, when she had a workers' compensation injury a couple years before, she had been sent to a local physician.

Kennedy knew Myers had young children, and Myers and Myers' attorney explained to Ingram and Kennedy that due to her childcare responsibilities, Myers could not just take off to Chicago on such short notice. Kennedy's orders and his stopping of Occupational Leave pay appear to show increasing hostility over Myers' extended health issues in recovering from surgery and the prolonged workers' compensation claim.

The day Myers returned from leave, Kennedy held an investigative meeting. Myers was not provided with notice of this meeting or allowed to delay this meeting to prepare. Myers asserts that the way Kennedy spoke to her at the meeting was threatening, vindictive, and hostile, and this appears to be corroborated by other employees who were present at the meeting. Even though Myers never had any disciplinary or absentee problems before, and appeared to be an

exemplary employee who had only received positive feedback from Kennedy and Ingram, Myers was suspended and subsequently recommended for discharge by Kennedy. Discharge was the last level of discipline in a five step disciplinary regime. The way the meeting was conducted, Kennedy's lack of consideration of Myers seemingly legitimate reasons for being unable to comply with the direct order, and the decision to recommend discharge (even though Myers had no previous problems) may be viewed as evidencing a hostile attitude. A reasonable jury could conclude that Kennedy's treatment of Myers was due to her filing of a workers' compensation claim, which he questioned whether United should be responsible for in the first place, and for which he thought was unnecessarily prolonged.

Due to Kennedy's recommendation for discharge, an IRH was held. Hitzeman, the Union representative, testified that at the meeting Kennedy aggressively told Hitzeman, "Silvia's doctor will never admit to any errors in a court of law. He'll never show up." This comment suggests Kennedy had a hostile attitude because he believed that Myers should have been released to work and was not entitled to her prolonged workers' compensation claim.

Therefore, based on the proximity of the termination to Myers exercise of her workers' compensation rights (the second surgery and second leave), and based on the comments made by Kennedy and his actions, which could be viewed as evidencing hostility, this Court finds Myers has established a prima facie case for retaliatory discharge.

## 2. Legitimate Nondiscriminatory Reason

Because Myers has established a prima facie case, the burden shifts to United to articulate a legitimate, non-discriminatory reason for its actions. United asserts that Myers was terminated for violating several sections of the Rules of Conduct: (1) Rule No. 3 – Falsely

claiming sick leave pay, occupational injury leave pay; other paid leave or workmen's

compensation benefits; (2) Rule No. 22 – Refusing to comply with a direct order of a supervisor

or other person in authority; (3) Rule No. 29 – Failing to comply with a direct order of a

supervisor or other person in authority; and (4) Rule No. 33 – Unauthorized absence from work.

Myers admits in her Response to Motion for Summary Judgment, "there is a basis, albeit

sketchy, in fact for the allegation that she committed insubordination and that, as a general

matter, insubordination constitutes a sufficient reason for terminating an employee." In addition,

if an employee falsely claimed workers' compensation benefits or took an unauthorized absence

from work, that could be grounds for dismissal. This Court finds that United has established a

legitimate non-discriminatory reason for termination, her violations of Rules of Conduct.

### 3. Pretext

Because United has established a legitimate nondiscriminatory reason for the

termination, the burden shifts back to Myers to establish pretext. To establish pretext, a plaintiff

may meet her burden by showing that the employer's proffered reason for adverse employment

action: (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3)

did not actually motivate the adverse employment action. *Davison,* 562 F.Supp.2d at 982, *cited

by Killbarger*, 697 N.E.2d at 1083.

A court may consider the "reasonableness of an employer's decision . . . to the extent that

such an inquiry sheds light on whether the employer's proffered reason for the employment

action was its actual motivation." *Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 576 (6th

Cir. 2003), *cited by Conner v. State Farm Mut. Auto. Ins. Co.*,  273 F.App'x 438, 443 (6th Cir.

2008). For instance, if termination for violations of the listed Rules of Conduct was reasonable,

that could shed light on whether United's proffered reason was its actual motivation.

The facts show that Myers' physician informed her she was not released to work, and that Myers' physician informed United that there had been a mistake on the ESF and that Myers was not released to work. Myers was never given an ESF for a physician to fill out, including for her previous workers' compensation injury, and her supervisor, Ingram, had never even heard of an ESF before. This suggests that the ESF was not a really a requirement and that the physician's oral instruction to United that Myers was not released to work should have been sufficient to authorize her absence from work. The only physician that ever examined Myers after her second surgery did not release her to return to work until January 9, 2006. A jury could therefore conclude that the asserted violations of the Rules of Conduct that Myers' falsely claimed workers' compensation benefits and was on unauthorized absence from work, have no basis in fact and did not actually motivate the adverse employment action.

The facts also show that Myers' request that the medical examination occur at a reasonable time and place was ignored. Rather, she was twice given an order to fly to Chicago for an examination on extremely short notice. No other employee had been ordered to fly to Chicago for a medical examination, with the exception of initial hiring exams and routine drug testing exams. And, those employees were always just orally instructed to fly to Chicago. They were not given written notice through the mail the night before the scheduled examination. Due to the short notice and Myers' childcare responsibilities, she asserts she was unable to comply with the direct orders, and Kennedy was informed of this. Myers' attorney informed Kennedy she was willing to be examined, provided she had reasonable notice. Based on the manner in which  Myers was ordered to go to Chicago, particularly the lack of notice and the fact that no

other employee had been treated that way, a reasonable jury could conclude that Kennedy gave unreasonable orders with which he knew Myers would be unable to comply, and that would form the basis for a termination. Indeed, a jury could conclude that Myers' firing for violating the orders was insufficient motivation for the termination and did not actually motivate the termination.

Based upon the evidence supporting the prima facie case, a reasonable jury could also conclude that Myers termination was actually  motivated by retaliatory animus in connection with her filing the workers' compensation claim because Kennedy did not believe the injury was work related and felt that Myers was manipulating the system to get workers' compensation to which she was not entitled. Union employees are not given performance evaluations. Ingram, however, described Myers as an employee who "put customer service high on her priority list." And Kennedy agreed Myers had a "good work record," that he had not had any problems or concerns with her conduct or performance, and that Myers had been "a good, quality United employee." Kennedy had also written to Myers, complimenting her on her performance, in the year before she filed the workers' compensation claim:

> Silvia, let me congratulate you on the excellent Customer Service you provided the Davis's. A true professional. (Letter dated 1/8/04)
>
> Silvia, another example of your professionalism—Congratulations. Nice work! (Letter dated 7/23/04)
>
> Silvia, another outstanding letter. I'm not surprised! Continue to set the standard for others to follow. Well done! (Letter dated 8/20/04).

Juxtaposing Myers' 18 years of exemplary performance against the December 23 and December 29 "insubordination", a jury could find that the termination for violation of direct orders was unreasonable and pretextual, and could find that the real reason for the discharge was

retaliatory animus for the workers' compensation claim.

## V. CONCLUSION

For the foregoing reasons, United's Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**


    __s/Algenon L. Marbley__
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT COURT**

**Dated: March 30, 2009**